UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

CIVIL ACTION NO. 11-407-KSF-CJS

IVAN PARKER GRIGGS                                                    PETITIONER

v.                          REPORT AND RECOMMENDATION

JOSEPH MEKO, WARDEN,
LITTLE SANDY CORRECTIONAL COMPLEX                  RESPONDENT

* * * * * * * * * *

On December 13, 2011, Petitioner Ivan Parker Griggs, through counsel, filed a Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus.  (R. 1).  On March 19, 2012, Respondent filed an Answer (R. 11), to which Petitioner filed a Reply (R. 14).[1]  Having all relevant documents and records before the Court, the matter is now ripe for consideration and preparation of a Report and Recommendation.  28 U.S.C. § 636(b).  For the reasons set forth below, it will be recommended that Petitioner's § 2254 petition be **denied.**

I.      PROCEDURAL BACKGROUND

On September 12, 2005, Petitioner was indicted for the murder of Mary Salyers[2] and for tampering with physical evidence.  (R. 11-3).  On October 11, 2006, a Fayette County, Kentucky, Circuit Court jury convicted Petitioner of both charges.  (R. 11-4).  Pursuant to Kentucky law, the

---

[1]  The standard briefing schedule for § 2254 matters was extended upon request, without objection, for both parties.  (R. 9, 10).

[2]  Ms. Salyers was a woman with whom Petitioner had engaged in an extramarital affair, which resulted in the birth of a child, Elizabeth Nicole ("Nicole").  While Nicole lived primarily with her mother, she also stayed with Petitioner and his wife Deborah every other weekend and for extended periods over the summer.  Ms. Salyers, Petitioner and Deborah were all involved in parenting Nicole.  At the time of the trial of this matter, Nicole was 17 years old.

court moved immediately to the sentencing phase.  (R. 11-4).  During the sentencing phase, the Commonwealth presented one witness.  Petitioner did not present any mitigation evidence during the penalty phase, nor did counsel make an opening statement.  (R. 11-4; R. 13, DVD of state trial held 10/11/06, at 10:45:00).  In his closing argument during the penalty phase, defense counsel referenced Defendant's lack of a prior record and his advanced age, 62, as a basis for mitigation. (*Id*., at 0:49:00 - 11:01:00).  Upon deliberation, the jury returned with a sentence recommendation, which the court imposed,[3] of thirty years of incarceration on the murder conviction and one year of incarceration on the tampering with physical evidence conviction, to be run consecutively.  (*Id*., at 14:38:00).  *See also* KRS § 532.060 (requiring a sentence for a Class A Felony to be not less than twenty years nor more than fifty years, or life imprisonment).

On direct appeal, the Kentucky Supreme Court recounted the factual history as follows:

Griggs was charged with the June 12 or 13, 2005, shooting death of Mary Salyers at her home in Lexington.  According to the Commonwealth's proof, Griggs and Salyers had a child together, Elizabeth Nicole, and since her birth in 1989 they had remained in contact in conjunction with sharing Nicole's custody.  Although the extra-marital affair had ended and Grigg's marriage had survived, there was evidence tending to show that Griggs continued to be jealous of Salyer's relationships with other men.

On June 12, 2005, Nicole was to begin a month-long summer visitation with Griggs, but that evening when Griggs and his wife went to Salyers's residence to pick her up, she was not present.  Earlier that day she had gone with a friend to a wedding and had not yet returned home.  Griggs expressed resentment at being thus inconvenienced, and he was also angered, the Commonwealth alleged, by the presence at Salyers's residence of a male friend, with whom, Griggs believed, Salyers was romantically involved.  A short time later, Nicole was delivered to the Griggses' residence to begin her visitation.  Later that night, between about 11:00 pm and midnight, Griggs confronted Salyers at her residence.  He fought with her and then killed her by shooting her twice in the head.

---

[3] Upon Petitioner's motion for immediate sentencing, the state court informed Petitioner of the rights he was waiving by proceeding immediately to sentencing and confirmed with him that this was his informed decision.  The court then imposed the jury's recommended sentence.

(R. 11-8; *Griggs v. Commonwealth*, No. 2006-SC-000846-MR, 2008 WL 1851080, at *1 (Ky. Apr. 24, 2008)).

Petitioner raised two issues on direct appeal: whether the trial court erred "when it refused to suppress [the Petitioner's] confession he made to investigating officers," and "when it refused to declare a mistrial when [Petitioner's] counsel belatedly objected to the fact that prior to making the confession [Petitioner] had not been properly read his *Miranda* rights." (*Id.*). The Kentucky Supreme Court, however, affirmed the trial court's judgment of conviction and sentence imposed. (*Id.* at *7).

Thereafter, Petitioner filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to Kentucky Rule of Criminal Procedure ("RCr") 11.42, or in the alternative, to grant a new sentencing hearing. (R. 11-15). As grounds for holding the sentence invalid, Petitioner argued that his counsel provided him with ineffective assistance. (*Id.*). Specifically, Petitioner argued that his attorney failed to: (1) investigate and present mitigation witnesses; (2) investigate and effectively present an extreme emotional disturbance defense; and (3) object to the incompleteness of the jury instructions. (*Id.*). On October 29, 2009, the trial court held an evidentiary hearing on all issues. After reviewing the record, the court denied Petitioner's RCr 11.42 motion. (*Id.*).

In denying Petitioner's motion, the court found that, as to Petitioner's argument regarding mitigation witnesses and an extreme emotional disturbance defense, Petitioner failed to satisfy the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). In particular, the court found that Petitioner's trial attorney, Mr. Lewter, "provided a highly credible trial strategy explanation for his failure to call such mitigation witnesses" and for his failure to call Petitioner or his wife to testify as to his extreme emotional disturbance at the time of the killing. (R. 11-15, at 2-4). Furthermore, the court found that "there was [not] a reasonable probability of a different result had Mr. Lewter called mitigation witnesses" or had Petitioner or his wife testified. (*Id.* at 2-5). Finally, the court

3

found that it was not ineffective assistance of counsel not to object to the jury instructions because the instructions were proper. (*Id.*, at 5-6).

Petitioner appealed the trial court's November 30, 2009, order denying his RCr 11.42 motion. On March 11, 2011, the Kentucky Court of Appeals affirmed the trial court's order, finding, like the trial court, that counsel's alleged failures were a result of reasonable trial strategy. (R. 11-19, at 348; *Griggs v. Commonwealth*, No. 2009-CA-002333-MR, 2011 WL 831931, at *5 (Ky. Ct. App. Mar. 11, 2011)). In addition, the Kentucky Court of Appeals found that there was not a significant likelihood that the outcome of Petitioner's trial would have been different had counsel called mitigation witnesses, objected to the jury instructions, or presented additional evidence of his extreme emotional disturbance. *Id.* at * 6-7.

Having exhausted his state-court remedies, Petitioner filed the present § 2254 Petition. (R. 1). In his Petition, Petitioner raises two claims of ineffective assistance of trial counsel, alleging that (1) counsel failed to investigate and effectively present an Extreme Emotional Disturbance defense, and (2) counsel failed to investigate and present mitigation evidence during the penalty phase of his trial. (*Id.*).

## II.  ANALYSIS

### A.  Standard of Review

Petitioner argues that this Court is not constrained by section 2254(d)(1) of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), because the state court's decisions involved an unreasonable application of clearly established federal law, as determined by the Supreme Court. (R. 1, at 18-20, 30). Therefore, Petitioner argues this Court should review his claims *de novo*. (*Id.* at 20).

4

It is well settled that where the state court adjudicated a petitioner's ineffective assistance of counsel claims on the merits, the court does not conduct a *de novo* review of a petitioner's claims unless the habeas court determines that the state court's decision was contrary to or involved an unreasonable application of federal law as determined by the Supreme Court of the United States.[4] *See Rice v. White*, 660 F.3d 242, 252 (6th Cir. 2011) (discussing *Panetti v. Quarterman*, 551 U.S. 930, 946 (2007) (holding state's unreasonable application of federal law permitted *de novo* review of the ineffective assistance claim on habeas review)).

Here, it is undisputed that the state court adjudicated Petitioner's ineffective assistance of counsel claims on the merits. Petitioner concedes this point in his Petition.  (R. 1, at 12) ("[t]he state court adjudicated Mr. Griggs's ineffective assistance of counsel claim on the merits.").  Therefore, the proper standard of review is set forth in § 2254(d), until such time as the Court determines that an exception to the relitigation bar of § 2254(d) has been satisfied.

Section 2254(d) states:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

---

[4] In the case on which Petitioner relies, the state courts found counsel's conduct was constitutionally deficient.  Only after the Sixth Circuit found the state court erred in its application of *Strickland's* prejudice prong and thus its decision was contrary to clearly established Supreme Court precedent, did the Court engage in a *de novo* review of the petitioner's claim.  *See Magana v. Hofbauer*, 263 F.3d 542, 550-51 (6th Cir. 2001).

"This is a 'difficult to meet' *Harrington v. Richter*, _U.S._, 131 S. Ct. 770, 786 (2011), and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, _U.S._, 131 S. Ct. 1388, 1398 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)) (internal quotations omitted).    Moreover, Petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 131 S. Ct. at 787-88.  Petitioner carries the burden of proof.  *Id.* at 785-86.

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'"  *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (quoting *Williams*, 529 U.S. at 405-06).

"[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694.  However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409.  Under AEDPA, the question

6

for this Court to answer "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

### B.    Ineffective Assistance of Counsel Claims

In his § 2254 Petition, Petitioner asserts that he was denied his Sixth Amendment right to the effective assistance of counsel because counsel failed to: 1) investigate and effectively present the defense of extreme emotional disturbance during the guilt phase of the trial; and 2) investigate and present mitigation evidence during the penalty phase of the trial.  (R. 1, at 13, 29).  Petitioner asserts that he was prejudiced by counsel's failures as there is a reasonable probability that had this evidence been properly presented at least one juror would have reached a different conclusion on whether he acted under extreme emotional disturbance and/or in their determination of an appropriate sentence.

It is undisputed that the clearly established law for analyzing ineffective assistance of counsel claims is *Strickland*, 466 U.S. at 668.  In *Strickland*, the Supreme Court held that to prevail on an ineffective assistance of counsel claim a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced the defense.  466 U.S. at 687.

The first prong of *Strickland* requires a showing that "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 688.  Applying the first prong requires, "[j]udicial scrutiny of counsel's performance must be highly deferential[,]" because it is "too tempting for a defendant to second-guess counsel's assistance after conviction . . . and . . . too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  *Id.* at 689.  In addition to a highly deferential standard, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of

7

reasonable professional assistance[.]" *Id.* Moreover, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691.

As to *Strickland's* second prong, counsel's error, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Id.* at 692. *Cf. United States v. Morrison*, 449 U.S. 361, 364-65 (1981). Accordingly, a petitioner "must show a reasonable probability, [which is a probability sufficient to undermine confidence in the outcome], that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

### 1. Ineffective Assistance of Counsel for Failure to Investigate and Present an Extreme Emotional Disturbance Defense

Petitioner asserts that he was denied his Sixth Amendment right to the effective assistance of counsel because his trial counsel failed to investigate and effectively present a defense of extreme emotional disturbance. (R. 1, at 29). To succeed on this claim, Petitioner must show that the Kentucky Court of Appeal's application of *Strickland* was unreasonable. Petitioner, however, is unable to show that the Kentucky Court erred in its finding that trial counsel's performance did not fall below an objective standard of reasonableness. Further, even if counsel's performance was constitutionally deficient, Petitioner did not establish a reasonable probability that, but for counsel's constitutionally deficient assistance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-88, 694.

Petitioner briefly discusses counsel's failure to make an opening statement without specifically alleging this as a basis of his ineffective assistance argument. To the extent that it is, trial counsel's decision not to make an opening statement is often a matter of trial strategy, which

is not a basis for a claim of ineffective assistance of counsel. *See Moss v. Hofbauer*, 286 F.3d 851, 863 (6th Cir. 2002) (citations omitted). Here, counsel explained during his testimony at the RCr 11.42 hearing that he almost never makes an opening statement because he has "been burned over the years" by clients changing their story as the trial progresses to something different from what he told the jury in his opening. (R. 13, DVD of state ct 11.42 evidentiary hrg. held 10/29/09; at 3:22:45). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689. Here, Petitioner has failed to offer any evidence to rebut this presumption or to otherwise demonstrate that counsel acted unreasonably in waiving the opening statement.

Petitioner also asserts that counsel's performance in presenting the extreme emotional disturbance defense was deficient because he did not call Deborah Griggs, Petitioner's wife (hereafter referred to as "Deborah," rather than Griggs, so as not to be confused with Petitioner Ivan Griggs), as a witness to discuss the stresses on Petitioner in the months preceding the killing. (R. 1, at 30-31). At the evidentiary hearing in state court, Deborah, now divorced from Petitioner, testified that Petitioner had problems with the victim on issues involving the raising of their teenage daughter. She also testified that Petitioner was stressed over the care of his mother who suffered from Alzheimer's disease. (R. 1, at 31-32). Lastly, Petitioner contends that Deborah's testimony would have established that Petitioner was having physical manifestations of his stress prior to the killing, including having a sleeping disorder and extreme weight loss. (R. 1, at 31-32).

The Court of Appeals, while identifying this issue, did not provide a specific explanation of its reasoning for affirming the circuit court's findings on this issue; however, its discussion

9

regarding counsel's alleged failures in mitigation discussed counsel's decision not to call Deborah,

which is also applicable to his argument that Deborah should have been called to testify during the

guilt stage to establish an extreme emotional disturbance defense.[5]  Specifically, in its analysis of

the mitigation issue, the Kentucky Court of Appeals explained that decisions relating to witness

selection are normally left to counsel's judgment and will not be second-guessed by hindsight; thus

requiring Petitioner to overcome a strong presumption that counsel's decision on who to call as a

witness was based on the exercise of reasonable professional judgment.  (R. 11-19, at 10-11).  The

Court of Appeals found Petitioner did not meet this burden as "counsel specifically testified that he

did not call Deborah Griggs to testify because he was concerned as to possible testimony she might

provide concerning domestic violence."  *Id*.

> The following analysis by the circuit court provides further support.

> The movant's second argument also does not satisfy the *Strickland* standard.  The
> movant argues that Mr. Lewter was ineffective in his investigation and presentation
> of an extreme emotional disturbance defense.  The basis of this claim is that Mr.
> Lewter did not call either the movant or his wife to testify about the emotional strains
> the movant had been experiencing in the months leading up to death of the victim.
> Most of the cited emotional strains arose out of the relationship between the movant
> and the victim.

> The movant was married to Ms. Griggs for twenty-nine (29) years.  In 1988, the
> movant had an extra marital affair with the victim, which resulted in a child.  The
> movant, his wife, and the victim all had an active role in the raising of the child and
> conflicts would arise between the three regarding the proper parenting strategy.
> Such issues included whether the child would take ADHD medication, whether the
> child could take a part time job, and when visits with the Griggs could take place.
> There was also testimony at the evidentiary hearing that the movant was suffering
> from stress related to the care of his mother who suffered from Alzheimer's disease.

---

[5] The Supreme Court has held that "determining whether a state court's decision resulted from an
unreasonable legal or factual conclusion does not require that there be an opinion from the state court
explaining the state court's reasoning." *See Harrington*, 131 S. Ct at 784 (citations omitted).  "Where a state
court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by
showing there was no reasonable basis for the state court to deny relief." *Id*.

Mr. Lewter had a number of sound trial strategy reasons not to call Ms. Griggs. He indicated that he did not call Ms. Griggs because of incidents of domestic violence in their marriage and Mr. Lewter did not want the jury to become aware of this fact. Seeing as how the death of the victim in this case also resulted from a domestic violence incident, the Court does not find it unreasonable to attempt to prevent the jury from discovering the movant had a history of domestic violence.

In a number of pretrial interviews, Ms. Griggs actually indicated a reluctance to testify. This was followed by a motion to prevent her from testifying based on the marital privilege. Judge Sheila Isaac ruled that Ms. Griggs could testify about certain matters, but not about statements made the night of the murder. Many of the items Ms. Griggs was permitted to testify about were incriminating to the defendant, while the topic she was prohibited from discussing may or may not have contained some support for an extreme emotional disturbance defense. It was not unreasonable for Mr. Lewter to be wary of Ms. Griggs and to conclude that Ms. Griggs' testimony could have been more damaging than helpful. The Court finds that not calling Ms. Griggs was a reasonable trial strategy. Furthermore, the Court does not find there was a reasonable probability of a different result had Ms. Griggs testified.

(R. 11-15, at 2-3).

The evidence presented at the evidentiary hearing supports this finding. In his testimony at the state evidentiary hearing, counsel stated that he feared calling Deborah because of what she might say during cross-examination. (R. 13, DVD of 11.42 evidentiary hrg. held 10/29/09; at 3:02:24). Counsel testified that he reviewed the recordings of Deborah's interviews with police and her conversations with Petitioner while he was incarcerated. (*Id.*, at 3:04:50, 3:22:10). Counsel knew of the prior abuse from the recordings of Deborah's conversations with the police.[6] In the jailhouse recordings, Deborah expressed her "hurt" given that Petitioner was alleged to have killed the woman he had previously had an affair with and with whom he had a child. (*Id.*, at 2:26:30). Not only was she "hurt," but Deborah indicated in a number of pretrial interviews that she was reluctant to testify. (R. 11-15, at 3). This reluctance was made known to counsel when he received

---

[6] Petitioner asserts that Deborah testified at the evidentiary hearing that the prior abuse consisted of him slapping her one time early in their marriage. Although her testimony was not so clear, even if he had hit her on only one occasion, it was not unreasonable for counsel to try to keep that evidence from the jury given that the killing also involved a domestic situation.

a telephone call from her attorney, stating that she did not want to testify.  Thus, counsel testified

that he did not want to call her because she was understandably upset, she knew damaging

information that could be elicited on cross, and she was hesitant to testify.[7]  Thus, at the time of trial,

it was reasonable that counsel understood the significant downside to calling Deborah against her

wishes, and made the decision not to call her as part of a trial strategy.

Moreover, even if Deborah had testified, much of the content of her testimony would have

been cumulative because the information was provided to the jury by the Commonwealth's

introduction of the Petitioner's taped confession.  During a tape-recorded conversation with police,

which was played for the jury, Petitioner explained the problems he had been having with the victim.

Petitioner explained that he was under significant stress because Nicole was having problems at

school due to the victim's failure to give Nicole her necessary ADHD medication.  (R. 13, DVD of

state trial held 10/10/06; at 13:45:00).  Furthermore, Petitioner told police that he acted out of rage

because he felt he was "set-up."[8]  Petitioner qualified his statement, stating that similar incidences

had occurred prior to the incident, but that he had never felt "set-up" before.  (*Id*.).

Petitioner also claims that Deborah could have provided testimony of the additional stress

Petitioner was experiencing at the time of the killing and provided information on his physical

manifestations of stress that would have assisted in establishing a successful extreme emotional

---

[7] Petitioner asserts that Deborah's testimony during the state evidentiary hearing proves she could ably withstand a cross-examination.  (R. 1, at 37).  However, Petitioner fails to account for the amount of time that had passed.  At the time of the trial, the evidence and Deborah's actions indicated that she was not a willing witness.

[8] During the state evidentiary hearing it was clear that Petitioner felt "set up" because he had called the victim prior to arriving to pick up Nicole, and the victim did not tell him Nicole was not at the house. When he arrived, he sat in the car waiting for Nicole, but when the door opened a man walked out and the victim was at the door in a robe.  She closed the door without speaking to Petitioner, but then called his cell phone to tell him Nicole was not home.  The victim did not explain why she did not tell Petitioner that Nicole was not home when he called to say he was on his way to get her.  Petitioner felt the victim set him up so as to see the man leave her residence.

disturbance defense. *See* (R. 1, at 38). Specifically, Petitioner argues Deborah would have testified that Petitioner had lost thirty pounds because of the stress in his life and was taking sleeping pills for a stress-induced sleeping disorder. (*Id.*). However, Deborah's testimony at the state evidentiary hearing does not support Petitioner's contentions. During her testimony, she stated that Petitioner had lost a lot of weight, but contrary to Petitioner's assertion, she also stated that Petitioner had made a conscious decision to lose the weight. (R. 13, DVD of 11.42 evidentiary hrg. held 10/29/09; at 2:21:40). In addition, Petitioner asserts that Deborah would have testified that Petitioner's stress caused his sleeping disorder. (R. 1, at 38). Yet, her testimony did not support this contention either. In her testimony, Deborah verified that the Petitioner had sleeping pills next to the bed; however, it was Petitioner's counsel that suggested the sleeping disorder was a result of the continued stress. (R. 13, DVD of 11.42 evidentiary hrg. held 10/29/09; at 2:21:35). Deborah did not affirmatively agree with the suggestion.

After considering this evidence and these arguments, the Court finds that the decision of the Kentucky courts on this issue was not an unreasonable application of *Strickland*. To the contrary, the reasons counsel provided at the evidentiary hearing for not calling Deborah in conjunction with the limited additional information she would have provided support the Kentucky court's conclusion that counsel's decision was based on a reasonable trial strategy.

Petitioner also argues that counsel's closing argument was deficient because he failed to argue two essential points of Kentucky law relating to the extreme emotional disturbance defense: (1) that the reasonableness of Petitioner's provocation under the circumstances was to be judged as Petitioner perceived the circumstances; and (2) that there is no requirement for a definite time frame between when the extreme emotional disturbance is triggered and when the homicide occurred. (R. 1, at 40).

The Kentucky Court of Appeals addressed these arguments and found as follows:

> Concerning [Petitioner's] assertions regarding closing arguments, the Commonwealth argues that this is simply another attack on trial counsel's strategy. The Commonwealth notes that during closing, counsel used the "straw that broke the camel's back" idiom to explain how the accumulation of stressors in [Petitioner's] life ultimately led to the murder. He also discussed the cause of [Petitioner's] anger prior to the time of the murder, and argued that [Petitioner] was acting under extreme emotional disturbance at the time he committed the murder.
>
> Having reviewed the record and applicable law, we are in agreement with the Commonwealth that [Petitioner's] arguments concerning counsel's closing essentially amount to an attack on trial counsel's strategy. The mere fact that the jury did not find that [Petitioner] acted under extreme emotional disturbance does not mean that counsel's closing argument was deficient. It is well-settled that judicial scrutiny of counsel's performance must be highly deferential, and it is not the function of a reviewing court to usurp or second-guess the strategy of trial counsel. *Strickland*, 466 U.S. at 689.
>
> In the matter *sub judice*, [Petitioner's] trial counsel litigated the issue of extreme emotional disturbance, moved for directed verdict on the grounds that extreme emotional disturbance had not been disproved by the Commonwealth, and addressed that defense in closing arguments before the jury. Indeed, enough evidence was presented by [Petitioner's] counsel to warrant an instruction on extreme emotional disturbance, which further illustrates counsel's effective performance. As our courts have held, an extreme emotional disturbance instruction must be supported by definite, non-speculative evidence. *Holland v. Commonwealth*, 114 S.W.3d 792, 807 (Ky. 2003)(quoting *Hudson v. Commonwealth*, 979 S.W.2d 106, 109 (Ky. 1998)). In the matter *sub judice*, even without testimony from [Petitioner] himself, counsel produced enough evidence to warrant such an instruction. Accordingly, we cannot find that counsel's performance fell below an objective standard of reasonableness, and we decline to reverse on this basis.

*Griggs*, 2011 WL 831931, at *7 (internal quotations omitted).

Petitioner first asserts that counsel neglected to argue that the reasonableness of the provocation is judged as Petitioner perceived the circumstances. (*Id.*). To the contrary, counsel directly addressed this point in his closing argument. During closing, counsel stated that the "one thing that breaks his back or puts a person over the edge" must be "based upon something as perceived by the defendant, you look at it through his eyes." (R. 13, DVD of state trial held

14

10/10/06, at 15:49:00 – 15:49:30).  Thus, it cannot be said that counsel's closing argument was deficient in this regard.

Petitioner also claims counsel neglected to argue that there is no requirement under Kentucky law for a definite time frame between the triggering event and the resulting homicide.  (R. 1, at 40). Petitioner also argues that counsel did not articulate to the jury what the triggering event was, but instead instructed them that it was not necessary to know what the triggering event was in this case. (*Id.*).  However, counsel addressed both of these contentions in his closing argument.

As to a definite time, counsel stated that the law required a temporary state of mind, but he also explained that the rage could continue for some time prior to the final act.  (R. 13, DVD of state trial held 10/10/09, at 16:28:30).  Petitioner, however, argues that counsel's closing argument was deficient because he did not expressly explain "that there was no requirement that the 'homicide occur concurrently with the provocation, or even shortly thereafter, so long as the provocation remains uninterrupted until the killing.'"  (R. 1, at 40-41, citing cases).  Despite his failure to make such an affirmative statement, counsel adequately conveyed to the jury that there was not a definite time period in which Petitioner had to act for his actions to be considered to have been performed under an extreme emotional disturbance.

As to the triggering event, counsel more than adequately explained that the triggering event for Petitioner was the cumulative impact of several ongoing disputes with the victim, culminating with the events that occurred on the night of her killing.  Counsel described the triggering event using the "straw that broke the camel's back" idiom.  (R. 13, DVD of state trial held 10/10/09, at 15:48:30 - 16:11:15).  Counsel explained that during the weeks and months leading up to the killing, Petitioner had become increasingly more upset with the way the victim had been acting. Specifically, counsel stated that it was not just about one piece of straw, but was a culmination of

15

events.  More specifically, counsel discussed how upset both Petitioner and his wife were when they arrived to pick up Nicole, but found that she was not present.  Counsel continued, that while to a detached third-party it may seem trivial, to Petitioner it was a big deal because of everything else that had happened between them.  Counsel reminded the jury that the Petitioner told the police about Brian, the man who was at the victim's house when Petitioner came to pick up Nicole, the fact that Ms. Salyers did not call him to tell him his daughter was not home, and his rage.  Counsel argued that the events of the day had been eating at Petitioner, stating he was sitting in his house upset about Ms. Salyers not telling him that Nicole was not home; thinking of the victim over there with Brian, and he decided to go over to her house to confront her and ask her why she did not call, why she was still seeing Brian, and ask her what is going on with Brian.  (*Id.*, at 15:58:00).  Counsel argued that the killing was not planned, it happened during a struggle.  Counsel's argument articulated the basis from which the jury could find extreme emotional distress.  Thus, the Kentucky Court of Appeals did not unreasonably apply *Strickland* to the facts of this case and its finding that counsel was not constitutionally deficient in his presentation of the extreme emotional disturbance defense was reasonable.

Even if counsel's performance in presenting an extreme emotional disturbance defense had been constitutionally inadequate, Petitioner has failed to establish that but for counsel's unprofessional errors, the result of the proceeding would have been different.  *See Strickland*, 466 U.S. 694.  First, as noted by the Kentucky circuit court, there is not a reasonable probability that Deborah's testimony would have altered the verdict.  Instead, as noted above, much of her testimony was commutative to the information provided in the Petitioner's recorded statement to the police, which was played for the jury.  In addition, Deborah's testimony did not substantiate Petitioner's claim that he had been experiencing physical manifestations of stress at the time of the killing. The

16

only additional stressor that was unknown to the jury that Deborah could have testified about was Petitioner's stress over the care of his ailing mother who suffered from Alzheimer's.

This additional evidence, however, would not have mitigated the evidence presented by the Commonwealth.  The Commonwealth provided evidence that demonstrated the killing was not a spur of the moment decision, but was a contemplated decision made hours after the triggering event.  Specifically, evidence was presented from which the jury could determine that Petitioner had been fixated on the victim for months.  Nicole testified that she had seen Petitioner drive by the victim's home when he had no reason to be there, and that Petitioner told her he had seen the victim having sex on the floor of her apartment with Brian, when Nicole knew that was not true.  Nicole also testified that just a few weeks before the killing, she heard Petitioner threaten the victim, stating that he might bust in sometime and kill the victim and Brian. (R. 11-8, at 13; *Griggs*, 2008 WL 1851080, at \*7).  Petitioner's confession substantiated the fact that he went to the victim's home, armed with a knife and a gun, hours after the alleged triggering event, providing the jury with a basis for finding the killing was a contemplated decision and not an act caused by extreme emotional disturbance.

Petitioner also has failed to establish that it is reasonably likely the outcome of this trial would have been different if his counsel's closing argument had more adequately addressed the issues of Petitioner's rage at being "set-up" by the victim and the lack of a specific requirement that the act be contemporaneous with the triggering event to constitute a finding of extreme emotional disturbance.  Petitioner argues there is a reasonable probability that because of counsel's deficient closing, the jury did not understand the extreme emotional disturbance defense.  He further argues that the Kentucky Court of Appeal's unreasonably applied *Strickland*'s prejudice prong on this claim because that court did not apply the "reasonable probability" standard in making its finding.  However, the Supreme Court has held that "determining whether a state court's decision resulted

17

from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *See Harrington,* 131 S. Ct at 784 (citations omitted). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id.*

Here, the Kentucky Court of Appeals found the jury instructions were a correct statement of Kentucky law, and there is no basis for Petitioner's assertion that had the jury heard a more articulate closing argument, its decision would have been different. As explained above, counsel explained that when determining if Petitioner acted under extreme emotional distress the jury must look at how the Petitioner perceived the facts, and counsel discussed how the events of the day were eating at Petitioner until he finally decided to go and confront the victim about the issues, including why she did not call to tell him Nicole was not home, and why she was still seeing Brian. (R. 13, DVD of state trial held 10/10/06, at 16:01-18). Despite counsel's argument regarding Petitioner's rage, jealousy and anger, the jury found that his actions were not made under extreme emotional distress. Petitioner has not meet his burden of demonstrating that the Kentucky Court of Appeal's decision, which decision had found that he failed to establish the prejudice prong of *Strickland*, was unreasonable.

### 2. Ineffective Assistance of Counsel for Failing to Present Mitigation Evidence during the Penalty Phase

Petitioner asserts that he was denied his Sixth Amendment right to the effective assistance of counsel because his trial counsel failed to investigate and present mitigation evidence during the penalty phase. (R. 1, at 13-29). Petitioner contends that had the jury heard testimony of his church involvement, his good reputation among the members of the church, and his conduct as a good

18

father, it would not have punished him with his current sentence.  *See* (R. 1, at 14) ("the witnesses could have offered valuable testimony in mitigation of punishment").  In support of his argument, Petitioner presented four witnesses during a state court evidentiary hearing on his RCr 11.42 motion, and all testified they were available to present testimony of Petitioner's good character during the penalty phase of his trial, but counsel never contacted them.  Specifically, the testimony of the witnesses at the state evidentiary hearing established that: Petitioner was an active member of Shiloh Baptist Church; he was well known to the congregation of the church; he had a favorable reputation among the members of the church; he was reliable and the preacher often relied on his assistance in church activities; and he volunteered much of his time to the church.  (R. 1, at 14-15, R.13, DVD of 11.42 evidentiary hrg. held 10/29/09; at 2:36:30).  In addition, Petitioner's family members testified that he was a "good father." (*Id.*).  Petitioner argues that the Kentucky Court of Appeal's decision, finding that counsel's decision not to investigate and present mitigation evidence was a strategic decision, is "contrary to" and is an "unreasonable application of" Supreme Court precedent. (R. 1, at 18).

The Kentucky Court of Appeals applied *Strickland* to Petitioner's claim and concluded that he did not satisfy either of the two prongs.  The court stated:

> Having reviewed the record, including counsel's testimony during the course of the evidentiary hearing, we are simply not persuaded that counsel's decision not to call mitigation witnesses fell below an objective standard of reasonableness.  While counsel may not have specifically addressed the EPO issue until questioned by the court, counsel was no doubt aware of the EPO, as well as [Petitioner's] history of domestic violence.  Indeed, counsel specifically testified that he did not call Deborah Griggs to testify because he was concerned as to possible testimony she might provide concerning domestic violence.  We do not agree with [Petitioner] that this was only a post-hoc rationalization simply because counsel explained the ramifications of calling such witnesses in response to a question by the court.
>
> Moreover, we cannot find that a significant likelihood exists that the outcome of [Petitioner's] trial would have been different had these witnesses been called.

> Clearly [Petitioner] has a history that is significant for multiple episodes of domestic violence. The Commonwealth was aware of this evidence, and would certainly have utilized it in rebuttal had [Petitioner] introduced evidence of good character. As a result, we find that the trial court's denial of [Petitioner's] RCr 11.42 motion as it pertained to this issue was supported by substantial evidence, and we affirm.

*Griggs*, 2011 WL 831931, at *6 (footnote omitted).

The question before this Court on habeas review is whether the Kentucky Court of Appeal's application of *Strickland* was reasonable. *See* 28 U.S.C. § 2254(d)(1); *Harrington*, 131 S. Ct. at 786 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.").

Petitioner's claim, that counsel's performance was deficient because counsel failed to conduct a mitigation investigation, is unpersuasive. *See* (R. 1, at 19-20). Petitioner correctly argues that the mere fact a counsel's conduct was based on strategy does not foreclose a finding that counsel acted in a constitutionally ineffective manner. *Strickland*, 466 U.S. at 690-91; *see, e.g.*, *Sears v. Upton*, ___ U.S. ___, 130 S. Ct. 3259, 3265 (2010); *Wiggins*, 539 U.S. at 533-35 (counsel not in a position to make reasonable strategic choices regarding mitigation where investigation itself was unreasonable); *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000) ("The relevant question is not whether counsel's choices were strategic, but whether they were reasonable."). In *Strickland,* the Supreme Court explained that

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

Here, the evidence produced at the state evidentiary hearing supports a finding that counsel's strategic decisions were reasonable. Petitioner presented four witnesses at the state evidentiary hearing, each of whom testified that counsel never contacted them during the trial, but that they were available to testify. All four witnesses testified to Petitioner's involvement in his church and his corresponding good reputation among the church's congregation. Petitioner's daughter, Deneen Griggs, testified that she contacted counsel at one point during the trial, but only to relay a message from the Petitioner. A friend of Petitioner, Malaby Byrd, testified to Petitioner's good reputation, but on cross stated that he was unaware of Petitioner's prior abuse toward his wife or the extramarital affair with the victim that produced a child. (R. 13, DVD of 11.42 evidentiary hrg. held 10/29/09; at 2:41:35).

Regardless of the witnesses' potential testimony, it was reasonable for counsel not to interview those four witnesses because of his belief that the value of the evidence of good character was not worth risking the jury hearing of his prior domestic abuse. According to *Strickland*:

> The reasonableness of counsel's actions may be determined or substantially influenced by the [petitioner's] own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the [petitioner] and on information supplied by the [petitioner]. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the [petitioner] has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a [petitioner] has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the [petitioner] may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

466 U.S. at 691 (citation omitted).

21

Here, counsel testified at the evidentiary hearing and provided multiple reasons for not conducting an investigation into mitigation witnesses and evidence. First, counsel testified that he had multiple conversations with Petitioner about the problems going on in Petitioner's life and how they could potentially impact the trial. (R. 13, DVD of 11.42 evidentiary hrg. held 10/29/09; at 2:49:40). Petitioner told counsel that he was having difficulty with family members due to an ongoing custody dispute over his daughter, Nicole, as well as a property dispute. He testified people were taking sides and he did not want to involve anyone. After discussing the matter with his client, counsel stated that Petitioner did not provide him the names and proposed testimony of potential witnesses and it was his understanding there were no suitable witnesses available.

Counsel also explained that he was worried about putting on any character witnesses because of Petitioner's prior domestic abuse against his wife and the emergency protective order ("EPO") that had been take out against him by the victim. Defense counsel had been successful in keeping the prior domestic abuse and EPO evidence from the jury; however, if evidence was presented of Petitioner's general good character, it would open the door to evidence of his bad character, thus informing the jury of the unfavorable facts.

While Petitioner acknowledges that evidence of good character can open the door to rebuttal evidence of bad character, he argues that counsel could have crafted his questions to avoid the inclusion of any damaging facts. (R. 1, at 23). Counsel addressed this issue at the state court evidentiary hearing when he stated:

> The danger is that if I put on a character witness who says that he's done charitable work for the church for ten years, he's a great guy, I love him, I trust my kids with him, and all that – the first question out of the Commonwealth's mouth is, "[w]ere you aware [that Petitioner had previously abused his wife or had an EPO issued against him]?" And that hurts when they bring up prior incidents because if you're vouching for his character, it's been held that it's a valid question for the Commonwealth. "Oh, you're saying he's such a nice guy, were you aware that he

22

threatened his ex-wife with a knife?  I have the documents right here."  "No, I wasn't aware of it."  Now the jury is aware of it.

(R. 13, DVD of 11.42 evidentiary hrg. held 10/29/09; at 3:31:26-3:32:40).  Counsel conceded that there were possible ways to avoid this pitfall, but that it is never certain that a witness will not accidentally say something that "opens-the-door."  Thus, the risk is always there. (*Id.* at 3:32:42-3:33:33).  Moreover, counsel stated that too many times in his thirty years of practice he has observed witnesses inadvertently step over the line and open the door to undesirable evidence.  Thus, while counsel knew of Petitioner's church involvement, he made a conscious choice not to investigate further or present mitigation evidence because he viewed it as too high of a risk that mitigation witnesses would be asked about Petitioner's prior bad conduct on cross-examination.[9]

Counsel also stated he had discussed potential witnesses with Petitioner, and Petitioner never mentioned one witness that he should talk to and also indicated that he did not want to get others involved because of the problems going on with the custody and property disputes.  The Supreme Court has warned that a court must "eliminate the distorting effects of hindsight," *Strickland*, 466 U.S. at 689, "because there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight [. . . ]." *Harrington*, 131 S. Ct. at 791.  The evidence presented to the state court supports a finding that

---

[9] The cases cited by Petitioner are distinguishable on this issue as counsel's decision not to investigate mitigation here was based on a strategic decision to avoid the risk of having the jury learn of Petitioner's prior bad acts of domestic violence, including an EPO taken out against him by the victim.  *See Dickerson v. Bagley*, 453 F.3d 690, 696 (6th Cir. 2006) (counsel  ineffective because an investigation into mitigation would have revealed a large body of mitigating evidence, including proof of very low IQ and poor family, educational and social history); *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (court held the failure to investigate a fact witness was not based on a reasoned professional judgment that the investigation was unnecessary); *see also Gowans v. Crews*, No. 1-311-JMH, 2012 WL 3309398, at ** 6-7  (E.D. Ky. Aug. 13, 2012) (citing, *Harrington*, 131 S. Ct. at 790 (there is a strong presumption that counsel's attention to minimizing the impact of defendants' bad acts to the exclusion of presenting evidence of his good character during the penalty phase reflects trial tactics rather than sheer neglect)).

counsel decided, after consultation with Petitioner, that evidence of his good character was not worth risking an opportunity for the jury to hear of Petitioner's prior bad acts.

For this same reason, this Court dismisses Petitioner's argument that this was a post-hoc realization for not conducting an investigation. Although counsel did not know specifically what these four witnesses would testify to, he did know that there was a real possibility their answers to his questioning could open the door for the Commonwealth to ask about Petitioner's bad character. Thus, counsel's decision not to further investigate or to call mitigating witnesses was supported by reasonable professional judgment. The decision of the Kentucky Court of Appeals in this regard was neither "contrary to" nor an "unreasonable application of" *Strickland*.

Petitioner also fails to satisfy the second *Strickland* prong because counsel's decision not to present mitigation witnesses did not prejudice the outcome of the proceedings. To satisfy *Strickland's* second prong, the petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[T]he question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. *Harrington*, 131 S. Ct. at 791-92 (citing *Wong v. Belmontes*, ___ U.S. ___, 130 S. Ct. 383, 390 (2009); *Strickland*, 466 U.S. at 693). Instead, the proper inquiry is whether it is "'reasonably likely' that the result would have been different . . . . The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 131 S. Ct. at 792-93.

Thus, to satisfy the prejudice prong, Petitioner must establish "a reasonable probability that a competent attorney, aware of [the available mitigating evidence], would have introduced it at

24

sentencing," and "that had the jury been confronted with this . . . mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Wong*, 103 S. Ct. at 386 (quoting *Wiggins*, 539 U.S. at 535-36). When assessing prejudice, the Court must weigh the evidence available in mitigation against the aggravating evidence. *Id.*

Here, Petitioner contends that testimony from his four witnesses would have produced a different sentence because there is a reasonable probability that at least one juror would have come to a different decision on the appropriate sentence. (R. 1, at 28). Petitioner's proposed mitigation evidence would have included his involvement at Shiloh Baptist Church, his work as an ordained deacon, his favorable reputation within the church community, and that he is a loving and supportive father and husband. (*Id.*). Petitioner argues that the mitigation evidence would have outweighed the limited aggravating evidence. (R. 1, at 26-29).

Petitioner's argument, however, is not well taken. This case is not a case in which the jury returned the maximum sentence. Instead, the jury returned a sentence of thirty years on the murder charge, which carried a maximum of fifty years or life. *See* KRS § 532.060. In light of the lesser sentence, it becomes increasingly difficult to establish that had the jury heard the mitigating witnesses, it would have further decreased the sentence– especially considering that the EPO and the prior domestic abuse had not yet been introduced as evidence at trial. It is reasonable for counsel to conclude that the negative impact of this evidence would have far outweighed the common character evidence that the mitigation witnesses would have offered. Based on this evidence, it was not unreasonable for the Kentucky Court of Appeals to find that Petitioner failed to establish a reasonable probability that the outcome of the proceedings would have been different but for counsel's failure to investigate and present mitigation evidence.

Accordingly, for the above reasons, the decision of the Kentucky Court of Appeals was neither an "unreasonable application of, nor contrary to," established Supreme Court precedent. Therefore, Petitioner's claim for ineffective assistance of counsel for failure to investigate and present mitigation evidence also fails.

## III.    CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Proceedings, effective December 1, 2009, the district court must issue or deny a certificate of appealability (COA) when it enters a final order adverse to the applicant.  A certificate may issue only if a petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  In cases where a district court has rejected a petitioner's constitutional claims of the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*

In this case, reasonable jurists would not debate the denial of Petitioner's § 2254 motion or conclude that the issues presented are adequate to deserve encouragement to proceed further.  *See Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484).  Accordingly, it will be recommended that a certificate of appealability be **denied** upon the District Court's entry of its final order in this matter.

## IV.    CONCLUSION AND RECOMMENDATIONS

For the reasons stated herein, **IT IS RECOMMENDED** that:

(1)    Petitioner's Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus (R. 1) be **denied;**

(2)    A Certificate of Appealability be **denied** by the District Court in conjunction with the Court's entry of its final order in the matter; and,

(3)    This action be **stricken** from the active docket of this Court.

Specific objections to the Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service or further appeal is waived.  Fed. R. Civ. P. 72(b)(2); *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd*, 474 U.S. 140, 155 (1985).  A general objection that does not "specify the issues of contention" is not sufficient to satisfy the requirement of a written and specific objection.  *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995) (citing *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508-09 (6th Cir. 1991)).  Poorly drafted objections, general objections, or objections that require a judge's interpretation should be afforded no effect and are insufficient to preserve the right of appeal.  *Howard*, 932 F.2d at 509.  A party may respond to another party's objections within fourteen (14) days of being served with a copy of those objections.  Fed. R. Civ. P. 72(b)(2).

Dated this 22nd day of January, 2013.



Signed By:

*Candace J. Smith*

**United States Magistrate Judge**